[No. 2142.]

S. P. HOLMES *v.* THE STATE.

MURDER — FACT CASE.— See the statement of the case for evidence in a murder trial *held* adverse to a verdict of murder in the second degree, because sufficient to establish the defense of insanity.

APPEAL from the District Court of Lamar. Tried below before the Hon. D. H. Scott.

The indictment charged the murder of Mrs. E. Tighe in Lamar county, Texas, on the 18th day of May, 1885. Trial resulted in the conviction of the appellant for murder in the second degree, and his punishment was affixed at a term of five years in the penitentiary.

Miss Maud Holmes, the daughter of the defendant, was the first witness for the State. She testified that her father and her mother had separated in January, 1885, and were not living together at the time of the homicide. Witness's mother and the children, including the witness, were living in Mr. Baldwin's house, in the city of Paris, Texas, when the killing occurred, and the defendant was living at the Ulmer place. Witness's mother kept a boarding-house. Witness's aunt Bess, the deceased, and her daughter Lillie Everett, had been at the house about four weeks when the killing occurred. Mr. Youmans had been boarding there about two weeks. About 10 o'clock at night on May 18, 1885, Lillie Everett and witness went to their room to retire, leaving Mrs. Holmes, the deceased and Mr. Youmans together in the north room. Within a very short time witness heard loud screaming in the north room, and presently Mrs. Holmes and deceased ran into the south room, the one then occupied by witness and Lillie Everett, and closed and locked the door. Within a few minutes the defendant burst through the door into the room, and commenced stabbing the deceased. Mrs. Holmes caught him, when he turned and commenced stabbing her. De-

ceased escaped from the room while defendant was stabbing Mrs. Holmes. Defendant broke loose from Mrs. Holmes and pursued the deceased. Witness, Lillie Everett and Mrs. Holmes then escaped from the house through the west door. At the gate witness met Messrs. Lee Conner and Hunter. Witness saw the dead body of Mr. Youmans in the yard a few moments after she got out of the house. Mrs. Tighe died about 8 o'clock the next morning. The screaming in the north room began about five minutes after Lillie Everett and witness left it to go into the south room.

Isaac Hunter testified, for the State, that he knew the Baldwin house in the western part of the city of Paris, in which Mrs. Tighe was killed on the night of the 18th day of May, 1885. Witness was aroused from sleep by screams and cries of murder. He got up and ran to the Baldwin house, in the yard of which he found Mrs. Tighe lying, suffering from several knife stabs. Witness and others took Mrs. Tighe into the house and then went out again and found old man Youmans lying dead, on the north side of the north room of the house. He had been stabbed in a great many places.

R. J. Patton testified, for the State, that he arrested the defendant about 11 o'clock on the morning after the homicide, at his old home in Delta county, about twenty miles from Paris. Defendant was up stairs in his house. Witness went to the top of the steps and saw him in a room through a small crack, and called to him to come out and surrender. He came to the door and stood just inside of the door near the facing, having an old pepper-box pistol in his hand, loaded all around. He finally came out with the pistol in his hand, when the witness arrested him. He began forthwith to tell the witness about his trouble, and witness cautioned him to say nothing, as his statements might be used against him in evidence. Witness did not tell him that any of the parties he had cut were dead. On going down stairs, defendant ate some dinner, and then, saying he wanted a drink of water, stepped to the water bucket. Witness heard his teeth rattle against something, and when he looked, saw him with a small phial to his mouth. Witness slapped it out of his hands and then discovered that it was a morphine bottle. Witness sent immediately for a physician, fearing that defendant had succeeded in swallowing a dangerous quantity of the drug. After working with defendant awhile, witness started with him to Paris. On the way defendant asked witness what damage he had done. Witness did not then know that any of the injured parties were dead, and could only tell defendant that he had cut the ladies and old man Youmans pretty badly. Defendant told witness

that he went to the window of the south room and saw Mrs. Tighe, his wife and old man Youmans sitting close together; that Youmans had a lemon squeezer in his hands, and was preparing lemonade for the women; that he could stand his blood boiling no longer, and accordingly went into the house, when his wife caught him and he cut her to make her release him; that Youmans then started at him with a chair, when he turned and cut Youmans; that Youmans then ran out of the house and returned with a billet of wood, when the women made at him with a board, and he commenced cutting to kill. Witness jailed the defendant in Paris.

Lee Conner testified, for the State, that while passing on Graham street in Paris, about 10 o'clock on the night of May 18, 1885, he heard screams issuing from the house then occupied by Mrs. Holmes. He ran to that house and met some women at the gate, whom he did not know. They said that defendant was in the house killing all of the inmates. Witness went on to the house and found all the doors open but could not find Holmes, the defendant, or any one else in the house. Witness then went back and helped carry a wounded woman into the house. He found that woman lying in the yard suffering from several severe wounds, which appeared to have been inflicted with a knife. Witness then started around the house, on the north side of which he found the dead body of an old man whom he did not know. The body was still warm, but the man had ceased to breathe. He had several bad cuts on his body and was very bloody. Witness got to the house in less than two minutes after he heard the screams and the cries of "murder." He went into the house immediately in quest of the murderer, but he had fled. Witness then learned that the old man he found dead, north of the house, was old man Youmans, and that the lady he assisted in taking into the house was Mrs. Tighe. Mrs. Tighe first fell on the sidewalk outside of the gate, when she was assisted back into the yard where she fell again. Witness then left her in the hands of several parties and ran into the house, and then back and assisted in taking her into the house.

Tyer Holmes testified, for the State, that he was twenty-six years old, and was the son of the defendant, and the nephew of the deceased. Witness remembered a conversation which took place between his mother and defendant in April, 1885, at the Baldwin house, where his mother then lived. Mrs. Holmes sent for the defendant, who was living at the Ulmer place, to come to the house she occupied, to talk over some land matters. Mrs. Holmes and the defendant having separated, the former wanted a division of property

as previously agreed upon. Five years previous to this interview the defendant paid a visit to Virginia. When he started he and Mrs. Holmes agreed upon a division of the property, and Mrs. Holmes's interest in the real estate was designated, but defendant failed to sign the deeds. Prior to the interview in April defendant had refused to assign Mrs. Holmes her part of the land, and both got mad. Mrs. Holmes told defendant that she would sue him for the land, and that if he did not carefully correct some talk which he had started about her and her sister, the deceased, she would prosecute him for slander. Deceased took sides with Mrs. Holmes in the dispute which thereupon arose. Mrs. Tighe's character was then talked about in public, and she and Mrs. Holmes accused the defendant of circulating lies about them, and demanded a retraction of him. Witness did not know whether or not the defendant ever made a retraction. He agreed to deed Mrs. Holmes her part of the land, but said that, as the papers were all in Hunt county, he would have to go there first. Defendant drove Mrs. Holmes from his house in February, 1885, the trouble then being over a grocery bill. Defendant's feelings towards the deceased were very bitter. Defendant refused the demand of Mrs. Holmes and the deceased to publish in the Paris papers a retraction of his statements against their chastity. He said, in reply to their demand, that they could remove the bad effects of his charges by living correct lives in the future. The interview was an exceedingly angry and stormy one all around. Witness's brother Charley was present.

Charley Holmes was the next witness for the State. He testified that he was present at the interview between his father, the defendant, his mother and Mrs. Tighe, on the occasion referred to by the last witness. Mrs. Holmes told defendant that she wanted her part of the property, and that if he did not give it up, she would sue him for it. Defendant told her in reply to "pop her whip;" that she had no money to sue with. Mrs. Holmes then told defendant that he had to retract what he had said about her and Mrs. Tighe. Mrs. Tighe, speaking, said to defendant, "You have slandered me and my daughter, and you will have that to retract." Defendant replied: "Oh! I thought you came down here as a ministering angel instead of a destroying one." Defendant and Mrs. Tighe were never on good terms. Defendant said that Mrs. Tighe had a little education and that it made a fool of her, and that he would permit no woman to "wear the breeches" over him.

Doctor W. E. Dailey testified, for the State, that Mrs. Tighe died from the effects of a large number of wounds inflicted with a knife

or like instrument. The cuts were about the stomach and bowels. The State closed.

The defense first read in evidence the deposition of R. R. Hazlewood. It recited in substance that the witness had known the defendant intimately for several years. During the longer period of witness's acquaintance with the defendant, he regarded him as a very affable, friendly, well-conducted gentleman, possessed of very fair intelligence and information. The first time witness was led to suspect a failure of defendant's mental faculties was in April, 1881 or 1882, in St. Louis, Missouri, where the defendant joined him in a coach on a railway train. After a few words about his recent visit to Virginia, the defendant proceeded to relate his family troubles to witness. He stated in substance that he and his wife had made a division of their property, and that he went to Virginia with the intention of remaining, but that he thought, upon reflection, that if he permitted his daughter to remain in charge of his wife, she would be led astray, and that he concluded to return, gather his children, and assume their protection. He said that he had had a great deal of trouble with his wife, but that he would live with her in order to be able to exercise care over his children. He talked to witness some ten or twelve hours. Witness asked many questions during that time for the purpose of diverting his attention from the subject, but defendant would dispose of those questions in a short manner, and return immediately to the discussion of his family matters. All that defendant told witness could have been told in twenty minutes, but was repeated over and over again. From his conversation and facial expression, so different from his usual self as witness knew him, witness became satisfied that the defendant was insane, or at least that his mind was unsound.

W. B. Pratt testified, for the defense, that he lived in Delta county, Texas. He had known the defendant some nine or ten years, and about nine years ago had business transactions with him. He had known the defendant as a quiet and peaceable, intelligent, honest and upright citizen. Witness had never seen him angry. In April, 1885, the defendant came by the witness's house with a wagon load of utterly worthless pieces of old iron and wagon timbers and attachments, and an old gun of no value whatever, which looked as though it had been stocked by himself. Defendant called this gun his "goose-gun," and seemed to regard it as a most remarkable and valuable weapon. He told the witness that he was going to take the old wagon attachments, iron, etc., to Cooper, and employ an agent to sell them, and that if he failed to secure a reliable

agent, he intended to bring them back to witness's house, and get witness and his partner to take the agency. Defendant had collected a great many such worthless things about his house. He lived near the witness's house in Delta county, until about a year before this trial. His actions on the occasion referred to struck the witness as very singular and strange. Defendant is not as genial and friendly and cordial to his friends as he formerly was. Witness was a blacksmith.

J. P. Boyd testified that he lived in Delta county, Texas. He had known the defendant about twelve years. When witness first formed his acquaintance, at which time he had business transactions with him, he found him an intelligent, shrewd trader, and always afterwards had known him as a quiet, peaceable, law-abiding and honest citizen. He was at first very cordial to his friends, always meeting them with a hearty, affectionate greeting. His association was calculated to please, entertain and instruct the most fastidious. Witness first noticed his change from the distinguishing qualities mentioned when the defendant started to Virginia, some four or five years ago. He then came to witness, said that he and his wife had separated, and wanted witness to take charge of his business. Witness could never understand what defendant wanted him to do in connection with his business. His talk was incoherent and disconnected, and he never afterwards appeared his old self. In his conversation he would pass rapidly from one subject to another, getting through with none. He made no inquiry of witness's management of his business affairs after his return from Virginia. Witness managed his affairs as well as he knew how, during his absence, keeping his land tax paid up, etc. He appeared very much troubled about his domestic affairs for some little time before he started to Virginia. He seemed very much exercised over what he said was his daughter's exposure to vice and ruin, and was so exercised after his return. Witness thought, when he saw him on his return from Virginia, that the change in his mental condition, if anything, was for the worse. Witness was confident that his mind was deranged before he started to Virginia. His flighty conversation, his expressionless eyes, and his every act indicated as much. Witness could gather no certain information from his conversation as to what he was going to do or where he was going to, as he sometimes said Mexico, and sometimes Virginia. His conduct and personal appearance were the same after his return, and he talked incessantly about the ruin, or impending ruin, of his daughter by his wife. Witness had never heard Mrs. Holmes's virtue impeached. He told witness that he regretted the removal of his family to Paris.

William Pearce, for the defense, testified that he had known the defendant since 1871, and from that time until the spring of 1882 regarded him as a very intelligent, well informed man, perfectly upright, courteous and honest. In 1882 witness went to see him in regard to a land matter of importance to witness. He asked him if he could remember a certain corner of a certain piece of land. Defendant dropped his head, and for a minute appeared to be absorbed in thought. When he raised his head he began to talk about his family matters, and witness never could get his mind centered on the land matter. He talked very wild, his eyes had a very strange look, and his whole manner denoted mental derangement. The burden of his talk was his family trouble, his daughter's ruin or exposure to ruin, and his fatal removal to Paris.

Ira A. Perkins, who had known the defendant for ten years past, testified in substance that the mental condition of the defendant had, in his opinion, undergone a great and radical change since he first knew him. From an intelligent, companionable and entertaining person, he had changed into a flighty, wild talking, wild looking, unsocial and complaining man. Witness thought that beyond a doubt the defendant had been of unsound mind since sometime prior to the homicide.

Mr. Baker, of Delta county, testified, for the defense, that he had known the defendant some ten or twelve years. Until four or five years ago the defendant was a pleasant, agreeable and intelligent man, and a peaceable, law-abiding citizen. His mental condition underwent a great change about the time mentioned. His disposition changed entirely. He began to buy up and store on his farm a vast supply of worthless articles, utterly valueless to himself or to anybody else. He knew nothing whatever about blacksmith work, and yet he bought and preserved a large collection of worn-out, valueless blacksmith's tools. He bought up old axes, old machine iron, a decayed, worn-out thresher, and as many as a dozen wrecked wagons, which he piled on his farm in Delta county, where they still are.

George W. Jones, district and county clerk of Delta county, Texas, testified, for the defense, that he had known the defendant about twelve years, and had always regarded him as a good citizen. Defendant had a case in the Delta county court in February, 1885, and attended the trial. Several parties were in the court-room when the defendant entered. He stepped to the crowd, and in a serious, earnest manner, speaking to no one in particular, but to the crowd in general, said: "The star of Bethlehem has made its appearance. It appears but once in each five hundred years. You all ought to

see it, but you will have to get up quite early to see it." Witness did not know that defendant was then crazy, but he acted very much like he was. He appeared to be in sober, serious, solemn earnest. Nothing had been said by anybody which could possibly have, of itself, elicited the remark about the star of Bethlehem.

L. A. Lambeth testified, for the defense, that he met defendant in the court-house in February, 1885. Defendant, who appeared to be in great haste, stopped witness in the door and asked, in a very serious tone of voice and manner: "Tom, have you seen the star of Bethlehem? You should by all means see it. You will see something not seen for generations, and that will not be seen again for very many years." Defendant's occupation was that of a painter and carpenter, and until his derangement he was a man of some intelligence. He built a store-house for the witness in 1873 or 1874, and did a good job on it.

Mr. Wood, of Cooper, Delta county, Texas, testified, for the defense, that he had known the defendant about twelve years, and had known him as a law-abiding citizen and a Christian man. Defendant had a disagreement or trouble of some kind with a Mr. Wright about some hogs, about two years before this trial. Wright asked witness to go to defendant about the matter. Witness did so, and defendant told him that the hogs had damaged him $16, as assessed by his neighbors. Witness could not convince him that there had been no assessment of damages. Defendant insisted that there had, and evidently believed what he said. He finally agreed to accept $5 in liquidation of damages.

Tom Helm, of Delta county, testified, for the defense, that formerly the defendant was an intelligent, entertaining man, but was much changed mentally of late years, and was, the witness thought, deranged. He painted a house for witness in April, finishing a few days before the homicide. He would often quit his work, sometimes as often as seven or eight times a day, descend from the ladder on which he was at work, go into witness's house, and ask witness's wife. if she was getting more butter and eggs than she could use. Witness had heard him ask the same question as many as four times after supper. He would often ask about witness's little girl, saying that she reminded him of his, and go to crying. He talked a great deal about his family troubles and the ruin of his daughter. He frequently suspended work to stare into space, from which he would frequently turn excitedly with the one remark: "I declare." He often sat over the fire at witness's house, staring in the fire for a very long time, saying nothing, but apparently in a deep study.

He would then shift position with the remark, "I declare," and repeat the proceeding. Witness's wife said to him one night: "Mr. Holmes, you will have a fine orchard in Paris." Defendant hesitated some time, and finally replied: "Yes, when I was in Washington City, I went to see Le Duc." Defendant advised witness to fix up his pool of water, as it would just suit a big capitalist who was looking for water facilities in the county to operate machinery. Witness thought the defendant's mind wrong, and so expressed himself to his family. Mr. Oates, of Delta county, testified that he observed similar conduct on the part of the defendant about the same time that Mr. Helm did.

Tyer Holmes, taking the stand for the defense, testified that his father, the defendant, had acted very strangely for a long time. On one occasion a forest fire invaded and consumed his hog-pen. For no apparent reason in the world, he took up an idea that Mr. Wright started the fire. Witness found out the parties who started the fire, but in the face of unquestionable evidence could not convince the defendant that Wright had nothing to do with it. He thought and maintained against all evidence that Wright set the woods on fire for the express purpose of burning up his hog-pen. Defendant's bed-room was up stairs. Witness went home about midnight one night, about two weeks before the killing, and found his father standing in the middle of the room with his gun in his hand. He was very much excited and alarmed, and had no light in the room. He said that he was afraid John Greiner would kill him; that Greiner's little boy called him to come to the fence and get some money, and that Greiner himself came up to his fence gate. Defendant had no reason whatever to suspect John Greiner of designs upon his life. It was the opinion of the witness that the defendant's mind was then wrong.

Cross-examined, the witness stated, in substance, that he could recall his father's conduct in the family as far back as twenty years. At times the defendant was very cruel to the members of his family. He would become enraged at little or nothing, and whip the witness and his brother unmercifully. He beat them with a persimmon sprout so severely once that witness and his brother were laid up for a week. At other times he would treat his family as kindly as any one. He frequently denounced his wife as a bad woman, and on one occasion threatened to kill her if she would repeat her former charge that he had lied. He and his wife had separated three different times; once in Missouri, once in Delta county, Texas, and once in Paris. Defendant felt very bitterly towards

Mrs. Tighe, and accused her of lewd conduct without the least reason for making such a charge, so far as the witness knew.

Mr. Hicklin testified, for the defense, that he met the defendant at Alexander's house in Paris on the Friday before the homicide. Defendant in an excited, energetic manner proceeded at once to detail to the witness his family misfortunes. He said that he and his wife had trouble in Delta county; that he gave her a place in that county, but she came to Paris and set up a disreputable boarding-house with her sister, and that she and her sister were determined to prostitute his daughter. Defendant was evidently crazy. Witness advised him to consult Colonel W. H. Johnson, as to what he should do in the premises, and directed him to Colonel Johnson's house, and advised him to call there to see Colonel Johnson at noon, in order to get a strictly private conversation with Colonel Johnson, who was a little deaf.

G. H. Brooks testified, for the defense, that the defendant came to witness's grocery store in Paris on the Saturday night before the Monday of the killing, and said that he wanted some butter. Witness's assistant showed him some good butter, which he tasted. He then asked if there was not cheaper butter in the store. He was told that there was some old rancid butter in the store, that was unfit for food. He asked to see that butter. It was shown him and he said that it was good enough and that he would take it. He started to take it unwrapped, and to put it in an old badly soiled sack he had with him, but he finally allowed it to be wrapped in a paper, after which he put it in his dirty sack. He appeared very anxious and uneasy about something, and while the butter was being put up he went to the door three or four times and looked up and down the street, as though looking for some thing or some one. He left the store and was gone but a few moments, when he returned and said that he had forgotten what he had come for, and that he wanted some corn. When he first came into the store he brought an old cheese-hoop with him. He started to take the cheese-hoop and corn home, when he started the second time. Witness told him to leave them there, and he would send them to his house in his delivery wagon. Defendant agreed, and directed witness to have the things dumped over his fence. His conduct having excited curiosity, his old cheese-hoop was examined after he left, and found to contain an entire cheese which was perfectly rotten and of very offensive smell. Colonel Cooper, who was present in Brooks's store at the time mentioned, corroborated Brooks's statement.

J. D. Elliott, the proprietor of a family grocery store in Paris,

testified for the defense, in substance, that late in January, 1885, when it was exceedingly cold, the defendant came into his store and called the witness back to the rear part of the salesroom. He then proceeded to relate his family troubles to the witness, dwelling excitedly upon the impending ruin of his daughter by his wife and Mrs. Tighe. He said that his wife and Mrs. Tighe had set up a reputed private boarding-house, which he believed was nothing but a bawdy house; that since the establishment of that boarding-house his wife arrayed herself in false articles of apparel to entice the patronage of men; that she stuffed her bosom to fabricate full breasts, and wore a large bundle of some kind on her back underneath her dress, to give her an attractive form; that she did all this to inveigle men, and that the purpose of herself and her sister, Mrs. Tighe, was to prostitute the daughter. Defendant repeated the substance of this statement over and over, detaining the witness, despite witness's attempts to get away and to divert his talk to something else. He kept the witness standing there in the cold for at least two hours, listening to his excited talk, and witness came near freezing. Witness became fully satisfied that the defendant was out of his mind.

Mrs. Alexander testified, for the defense, that the defendant was her father. Defendant was at work at a work bench in the yard of his residence in Paris one day in April, 1885. Everything about the place had gone along unusually well and pleasantly. Suddenly the defendant dropped his tools, walked hastily into the house, pointed his finger at the piano and said excitedly: "D—n that thing! D—n that thing! D—n that thing! It has caused all my trouble. It killed my little girl! We must get it out of the house before the next moving." Witness had never before, in her whole life, heard the defendant use profane language. Witness told him that his complaint against the piano was foolish; that it was not brought into the house until after the death of his little girl. He persisted in his declaration that the piano was the cause of his little girl's death, and witness could not convince him to the contrary. On the Friday or Saturday before the tragedy the defendant told witness that he wanted her to bake him a birthday dinner on his fifty-eighth birthday, which would be in a few days. He said that he would get, among other things, some butter and cheese. He brought some butter and cheese to the house, both of which were so rancid that they were extremely offensive in smell. Witness and her mother-in-law, Mrs. Alexander, told him that the butter and cheese were rotten. He got mad, and insisted that both butter and

cheese were good, and could not be convinced otherwise. Mrs. Holmes, the witness's mother and defendant's wife, had always circulated in the best of society, and no other; she kept an eminently respectable boarding-house, and had none but people of unimpeachable respectability as boarders; she always dressed in the same plain old-lady style which was customary with her before she opened the boarding-house, and she wore neither false breasts nor bustles. She was an old lady and had grandchildren. Defendant was very peculiar in many respects. He was, at times, very suspicious of his family. He was quick to anger, and was tenacious of any opinion he formed, and could not possibly be shaken in anything he believed. At times he bought up large quantities of old useless plunder, of no service, either present or prospective, to himself or anybody else.

J. W. Jones testified, for the defense, that he had no personal acquaintance with the defendant, but saw him once before the homicide. Late in April or early in May, 1885, he came into the store where the witness was employed, and said that his name was Holmes; that he wanted to sell some land so that he could go to Florida with Colonel Scales. His general manner was so excited, unusual and strange that witness became satisfied that he was deranged.

Rev. R. W. Officer testified that he was the pastor of the Christian church in Paris, Texas. He had visited the family of the defendant, both defendant and Mrs. Holmes being members of his church. Defendant came to witness's front gate on the evening of Sunday before the Monday night of the killing, and called to witness. His first remark to witness was: "There is trouble up; and I want you to advise with me as to the best manner in which to proceed to get my wife to live with me, so that I can protect my daughter." He appeared to be in great trouble and said that his wife and Mrs. Tighe were on their way to Babylon, and would take his daughter with them; that his wife and Mrs. Tighe had gone to keeping a boarding-house which was not a proper kind of boarding-house, but was, in fact, a bawdy-house, and that his daughter, living in such a house, would be unprotected and soon ruined, but that, in order to protect his daughter, he was willing to live with his wife. Witness refused to go to see his wife about the matter, because he knew she would not live with him. He refused to advise defendant in the matter, because it was obvious to witness that he was not in a mental condition to receive advice. From his general appearance, conduct and manner, in connection with what the witness knew of him, he concluded that the defendant was crazy.

Mr. Alexander, the defendant's son-in-law, testified, for the defense, that he had thought the defendant crazy for some time prior to the killing. Witness had seen and talked to him in jail after his arrest for this murder. He, with C. B. Pegues, took a power of attorney into the jail for him to sign. He signed and acknowledged the instrument, and spoke of several matters, and directed that his personal effects should go to witness's wife. He gave Mr. Hodges, one of his attorneys, an order for a note, and a few days later said that he had forgotten giving it to witness's wife.

Lewis Ryan testified, for the defense, that he saw the defendant on the morning of the day on which the killing occurred. He discoursed his family affairs in pretty much the manner that he previously talked of them to other parties, and said that a plot to kill him had been organized. This was not the first, but was the most excited, on defendant's part, of several conversations witness had had with him, in which he spoke of his family troubles and the plot to kill him.

Doctor McReynolds testified, for the defense, that he had been a practicing physician but two years. He had known the defendant only since the tragedy. He visited the defendant four or five times in jail, and examined him to benefit himself in his profession. Witness did not think that defendant knew his profession or the purpose of his visits. It was the unqualified, professional opinion of the witness that the defendant was insane when he committed the homicide, and was insane before that time. Witness classed his insanity as melancholia, mixed with mania and monomania. His mind was worse than usual when he committed the homicide, and he was then in no wise responsible for what he did. In the opinion of the witness as a physician, the defendant was an insane man with perhaps occasional lucid intervals. He was crazy all the time to a certain extent, but worse at some than at other times, and at best was liable to break out at any moment in a rage or paroxysm of insanity, which he could not possibly control.

Cross-examined, witness said that Mr. Allen, one of defendant's counsel, was present at one of witness's conversations with defendant. Defendant told witness in one of his interviews that his father was dead, and that he had a brother who was an idiot from birth. He talked about the homicide he had committed, and neither claimed nor appeared to regret the act. He said simply that he went into the house and they came at him, when he cut them with a knife, and that he thought Youmans was seeking the ruin of his daughter. Temporary insanity had no connection with this case. The simple fact about the condition of the defendant was that, in the opinion

of the witness, he was insane all of the time, his malady taking at times a more malignant form than at others. There is no such thing as partial insanity. An insane man is crazy or more crazy, just as a man with a fever has fever or more fever. Like most crazy men, the defendant could talk rationally upon some subjects. The defendant, at the time of the killing, had no control whatever over his impulse, and was in no degree morally responsible for what he did. There was no possible room for doubt that he thought his wife, the deceased, and Youmans had conspired to prostitute his daughter. Undoubtedly he knew the fact that he was cutting the deceased when he cut her, but it is quite as certain that he thought he was doing right. Physicians could detect mental as well as physical maladies.

P. H. Allen, a lumber dealer in Paris, testified, for the defense, that, during the spring of 1885, the defendant came to his place of business to get a bill of lumber purchased by Mr. C. N. Allen. The bill comprised three wagon loads. When defendant came for the second load he asked for certain pieces of lumber which he had taken off on the first load, of which fact witness could not possibly convince him. When he returned for the third load, he asked for pieces he carried with the second load. Witness could not convince him of the fact, and when he finally told defendant that he could take like pieces, but that he would charge them extra to Mr. Allen, defendant got mad. He had wearied witness, and a few sharp words ensued. Witness thought his actions exceedingly strange.

Mr. Spurlin testified, for the defense, that the defendant came to his leather shop between 5 and 6 o'clock on the day of the homicide. He said that he wanted some leather, and proceeded to select it himself, and would not permit witness to select it for him. He took an indifferent piece with which he said he wanted to repair his harness. He then asked witness if he would wait for the money a few days, and witness told him that he would. He then asked how much it came to. Witness told him the amount was $4.05. He then said a few words about something else, and then asked again what the leather came to, and witness told him. He "switched off" four several times on other subjects, recurring each time to the question, "How much does it come to?" and each time the witness told him. He finally started out of the door, came back and asked the same question, and wrote the amount down in a small book. It was the opinion of the witness that he was crazy.

Colonel W. H. Johnson testified, for the defense, that he was a practicing attorney, residing in Paris, Texas. When the witness

went home to dinner on the day of the killing, he found the defendant on his porch waiting for him. He wanted, he said, to get some advice from the witness, and though he detained the witness a very long time, telling in an incoherent, rambling manner the troubles he had had in his family, the witness could never understand what he wanted witness to do. Defendant looked and acted very strangely; in a manner that indicated excitement, anxiety and fright. He said that his wife had taken his daughter from him, and was living with a strange man and a Mrs. Tighe, and that they had conspired to prostitute his daughter and murder him. Witness finally, after a two hours' interview, from which he could learn nothing as to what defendant wanted him to do in the premises, persuaded defendant to leave and call at his office later in the day. Witness thought the defendant crazy. He did not say that Hicklin or anybody else sent him to witness.

Charles Holmes, testifying for the defense, corroborated the defensive evidence given by his brother Tyer, and repeated the substance of previous accounts.of the interview between defendant and Mrs. Holmes in April, 1885, about the division of the property. He testified, in addition, that he went into the jail with J. R. G. Long to get defendant to sign a deed. The deed was read over to him and he signed it. It was the opinion of the witness that he would have signed his own death warrant as readily as any other document at that time. He told witness on that occasion that he had not made a deed to Allen, one of his attorneys, to the Delta county land, but that he had signed a number of papers; that he had deeded Allen his land in Paris; that Allen and Hodges, his other attorney, had brought him several papers which he signed; that he did not know what they were and would sign no more, fearing trouble. Witness had seen a deed signed by his father, conveying the Delta county land to Allen. The defense closed.

John Greiner testified, for the State, that he had known the defendant for twenty-five years, and had always believed him sane but eccentric. Witness had a small business transaction with defendant in April, 1885. Defendant came to witness's shop and got angry with the witness about a small bill which the witness owed him. He went off and placed the account in Mr. Allen's hands for collection. Allen called upon witness for a settlement, saying that he did not want to sue for so small an amount. Witness took his little boy with him and went to a point near the defendant's house. He then sent his little boy with the money to pay defendant. He did not want to speak to defendant, because of his treatment about

the bill. When witness's son handed defendant the money, he complained that it was not the amount by a few cents. Witness then walked down the fence to a point near where the defendant then was, and handed the boy the few additional cents demanded. The boy gave the money to defendant, and then walked off with the witness. Witness had done no injury to defendant, and defendant had no reason whatever to suspect him of designs upon his life. When angry, the defendant was a very violent man, and his appearance was strange and excited. What people in Texas seemed to call insanity, the witness called eccentricity.

J. R. G. Long testified, for the State, that he went into the jail two or three times after the defendant's incarceration to take his acknowledgments to deeds, etc. Defendant at first refused to sign the instruments, upon the ground that he had signed so many he was afraid of getting into trouble. He finally signed them. Witness had no opinion as to his sanity or insanity.

County Clerk C. B. Pegues testified, for the State, that he took the defendant's acknowledgment to two deeds after his incarceration in jail. Neither of the deeds was read to the defendant in the presence of the witness. Defendant seemed to understand what the deeds were.

Two or three witnesses introduced by the State detailed the circumstances of recent transactions with the defendant, and declared their belief in his sanity.

Doctors Rush, Neagle, Fort and Scales testified, for the State, that they were present during the trial and heard all of the evidence in this case. As experts, each of the physicians named testified that, assuming the truth of the testimony, there was no room left to doubt the insanity of the defendant before and at the time of the commission of the offense. All of the evidence, in the opinion of the witnesses, pointed directly to the insanity of the defendant, and it was purely consistent with such conclusion, and inconsistent with his sanity. His was a type of mixed insanity, the elements being melancholia, mania and monomania. He did not, in the opinion of either of the witnesses, think it at all wrong to kill the deceased persons when he assaulted them, and he had no manner of control over his impulse to do so. Doctor Neagle, who was the Lamar county jail physician, treated the defendant during his incarceration in jail, and, outside of the testimony, basing his opinion upon his examinations of the defendant's condition, was confident that he was insane at the time of the killing. Defendant had been growing gradually worse since his confinement, which was only natural.

It was scarcely probable that he knew right from wrong when he killed the deceased. Doctor Fort thought that at the time of the killing the defendant may have had mind enough to know the wrong of killing anybody but the persons he assaulted, but, with respect to them, he not only did not know the right or wrong of his act, but thought it perfectly right for him to kill them. He evidently thought that his family was going to ruin, and that his daughter was imminently threatened with prostitution. Doctor Scales thought that the defendant, at the time he made the murderous assaults, knew whom he was attacking, and possibly, a few minutes before, knew the wrong of committing murder, but he was nevertheless impelled to the deed by an uncontrollable impulse, and was in no sense morally responsible for what he did. His whole moral nature was completely subjected to the insane impulse to slay the parties he attacked. Witness Scales thought the defendant had been insane for several years.

Doctor C. G. Jones testified, for the defense, that he had been a practicing physician for forty years. He had heard all of the evidence upon this trial, and, taking it all to be true, was absolutely certain that the defendant was insane at the time of the killing. The testimony was consistent and conclusive. Insane persons are notoriously impervious to cold, and the defendant, according to Mr. Elliott, detained him repeating over and over again his family troubles as long as two hours, in the severe cold, and nearly caused Mr. Elliott to freeze. Insane people, it was known, had no sense of smell. The defendant, deprived of this faculty, thought the rotten cheese and butter pure. An impression once made upon the mind of a crazy person can never be removed, and hence defendant has believed since his hog pen burned up, and always will believe, in the face of incontrovertible proof to the contrary, that Mr. Wright set fire to that hog pen. He had horses, according to one of the witnesses, and yet he did not ride away after the homicide, but went on foot direct to his old home, where, if he had any sense at all, he must have known his capture was inevitable. Defendant had lucid moments, no doubt, but was crazy all the time. He was crazy at the time of the killing, and before that time, and is crazy now. In the opinion of the witness, he was born crazy. While defendant knew that it would be wrong for him, on this trial, to get up and kill some one in the court room, he not only did not know he did wrong in killing Mrs. Tighe, but thought he did right. His insanity was a mixture of melancholia and monomania.

The motion for new trial denounced the verdict as diametrically

opposed to the evidence, and assailed the correctness of the charge of the court in several particulars.

No brief for appellant has reached the Reporters.

*J. H. Burts*, Assistant Attorney-General, for the State.

White, Presiding Judge. We can never give our assent to a conviction for murder based alone upon the evidence as shown by this record.

The defense was insanity. If expert testimony of physicians is to be credited; if opinions of persons who had known the defendant longest and known him best are to be believed; and if any faith whatsoever is to be put in the judgment of perfect strangers, which judgment is formed from the actions of the man, then we unhesitatingly say, in our opinion, the defense was established as conclusively as it is possible to establish insanity in ninety-nine cases out of an hundred.

The evidence is wholly insufficient to support the verdict and judgment, and the judgment is therefore reversed and the cause remanded.

*Reversed and remanded.*